IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| MYCONE DENTAL SUPPLY CO., INC.,<br><br>            Plaintiff,<br><br>      v.<br><br>CREATIVE NAIL DESIGN, INC., et al.,<br><br>            Defendants. | Civil Action<br>No. 11-4380 (JBS-KMW)<br><br>**OPINION** |

APPEARANCES:

Ira A. Rosenau, Esq.
Klehr, Harrison, Harvey, Branzburg & Ellers, LLP
457 Haddonfield Road, suite 510
Cherry Hill, NJ 08002-2220
      Attorney for Plaintiff

Robert G. Shepherd, Esq.
Porzio Bromberg & Newman P.C.
29 Thanet Road, suite 201
Princeton, NJ 08540-3661
      -and-
Adam Hess, Esq.
Christopher T. La Testa, Esq.
Venable, LLP
575 7th St., NW
Washington, DC 20004
      Attorneys for Defendants

**SIMANDLE**, Chief Judge:

## I.    INTRODUCTION

This matter comes before the Court on the motion [Docket Item 73] of Plaintiff Mycone Dental Supply Co., d/b/a Keystone Research and Pharmaceutical ("Keystone") to dismiss the inequitable conduct affirmative defense and counterclaim which

Defendant Creative Nail Design ("CND") asserted in its Answer [Docket Item 54].[1] Keystone alleges that CND is infringing Keystone's United States Patent No. 5,965,147 ("the '147 Patent"), which embodies Keystone's invention of a toxicologically and dermatologically safe nail coating product comprised of a substantially acid-free hydrophilic acrylate monomer gel.[2] CND alleges that the claims of the '147 Patent are unenforceable because Keystone breached its duty of candor and good faith in dealing with the United States Patent and Trademark Office ("PTO") and engaged in inequitable conduct during the prosecution of the '147 Patent. Keystone has moved to dismiss this inequitable conduct claim and affirmative defense. Because CND has not pled sufficient facts indicating that

---

[1] After the briefing for the present motion was complete, Plaintiff filed an Amended Complaint Against All Defendants [Docket Item 108] with Defendants' written consent. The Court asked the parties via letter [Docket Item 112] whether the Amended Complaint moots the pending motion to dismiss and whether the parties wanted the Court to decide the issue as it was presently briefed. The parties responded via joint letter [Docket Item 115] noting that the Amended Complaint supersedes all previous pleadings. The parties stated, however, that the inequitable conduct issue had not changed and asked the Court to decide the issue on the present papers. The Court has complied with the parties' request. All citations in this Opinion therefore reference CND's first Answer [Docket Item 54], not CND's Answer [Docket Item 116] to the Amended Complaint.

[2] Plaintiff Keystone also claims that Defendants Beauty Systems Group, LLC, East Coast Salon Services, Inc., and Emiliani Enterprises, Inc. are infringing the '147 Patent by using, selling, or offering for sale CND's products that infringe the '147 Patent.

Keystone had specific intent to deceive the PTO, CND's inequitable conduct counterclaim will be dismissed and its inequitable conduct affirmative defense will be stricken, without prejudice to seeking leave to amend.

## II.   BACKGROUND

### A. Factual Background

The Court previously issued an Opinion [Docket Item 50] addressing Defendants' Motion to Dismiss [Docket Item 13]. Mycone Dental Supply Co., Inc. v. Creative Nail Design, Inc., CIV. 11-4380 (JBS-KMW), 2012 WL 3599368 (D.N.J. Aug. 17, 2012).[3] The present Opinion focuses only on the relevant allegations in CND's Answer and Counterclaim.

CND's Ninth Affirmative Defense and Third Counterclaim allege that the '147 Patent is unenforceable because of Keystone's inequitable conduct before the PTO. CND claims that Keystone breached its duty of candor and good faith dealing with the PTO and engaged in inequitable conduct in prosecuting the '147 Patent because Keystone "(a) knowingly and with deceptive

---

[3] The August 17, 2012 Opinion dismissed Plaintiff's unjust enrichment claim against all Defendants and dismissed Plaintiff's common law unfair competition claim against Defendants Beauty Systems Group, East Coast Salon Services, and Emiliani Enterprises. The Court did not dismiss the common law unfair competition claim against CND. In addition, the Court denied Defendants' motion to dismiss Plaintiff's claims for violation of § 43(a)(1)(B) of the Lanham Act against CND and violation of the New Jersey Fair Trade Act against CND.

intent failed to disclose to the PTO prior art that was material to the patentability of one or more claims of the '147 patents; and (b) knowingly and with deceptive intent failed to disclose to the PTO material information regarding inventorship of the '147 patent." (CND Answer and Counterclaims to Plaintiff's Complaint ("CND Answer") ¶ 22.)

CND claims that, as early as 1993 or 1994, Keystone approached CND seeking to become a "second source" supplier for CND's products. (CND Answer ¶ 23.) During these discussions, Keystone stated that it had noticed a "patent pending" marking on RADICAL, one of CND's nail care products, and inquired about CND's pending patent application. (CND Answer ¶ 23.) CND asserts that "Keystone alleged that it wanted to know more about the patent application to avoid infringing CND's forthcoming patent." (CND Answer ¶ 23.)

CND alleges that Keystone and CND met several times. (CND Answer ¶ 24.) One meeting occurred in Irvine, California, soon after RADICAL's introduction in 1993, and involved two issues: "Keystone's desire to do business with CND and Keystone's desire for more information about CND's patent application." (CND Answer ¶ 24.) The following employees attended the Irvine meeting: Cary Robinson, Keystone's President; Larry Steffier, Keystone's head scientist and the sole named inventor of the

4

'147 patent; Jim Nordstrom, CND's then-president; and Douglas
Schoon, CND's Director of Research and Design. (CND Answer ¶
24.)

CND "declined to show the application to Keystone," but
Schoon described its contents and the RADICAL product. (CND
Answer ¶ 24.) RADICAL was a liquid artificial nail product that
improved upon TURBO, one of CND's earlier liquid artificial nail
products. (CND Answer ¶ 24.) RADICAL and TURBO had excellent
adhesive properties because they included a monomer called
hydroxyethyl methacrylate ("HEMA"). (CND Answer ¶ 25.) Schoon
allegedly explained to Keystone that HEMA could improve the
adhesive properties of a primer or could be added directly to
the monomer blend to provide excellent adhesive properties
without using an additional primer. (CND Answer ¶ 25.) Schoon
also allegedly explained the chemical mechanism by which HEMA
improved adhesion to the natural nail plate and how RADICAL was
developed from TURBO and another CND product called SOLAR NAIL.
(CND Answer ¶ 25.)

CND ultimately decided not to do business with Keystone.
(CND Answer ¶ 26.)

In 1996, over one year before Keystone filed the '147
Patent application, CND allegedly stopped using HEMA and began
using another monomer, hydroxypropyl methacrylate ("HPMA"), in

the RADICAL formulation. (CND Answer ¶ 26.) CND had found that HPMA provided the same adhesive qualities as HEMA with less skin irritation. (CND Answer ¶ 26.)

On December 3, 1997, Keystone filed the application for the '147 Patent, which listed Larry Steffier, Keystone's head scientist, as the sole inventor. (CND Answer ¶ 27.) Claim One of the '147 Patent claimed: "A pretreatment composition for increasing the adhesion of adhesives and coatings to proteinaceous substrates comprising a liquid substantially acid-free hydrophilic acrylate monomer composition." (CND Answer ¶ 27.) Examples of the claimed "substantially acid-free hydrophilic acrylate monomers" listed in the patent application included both HEMA and HPMA, specifically listing HEMA as a preferred "substantially acid-free hydrophilic acrylate monomer." (CND Answer ¶ 27.)

Keystone allegedly distinguished its use of claimed monomers from prior art "by pointing out that the cited prior art included acrylate and methacrylate polymers, but that Keystone's invention used monomers." (CND Answer ¶ 28.) Keystone asserted that its invention was "novel" and "that no one had ever used these monomers in treating compositions for improving adhesion of adhesives and coatings." (CND Answer ¶ 28.) Keystone allegedly "did not disclose to the Patent Office any information

6

about CND's use of HEMA in RADICAL" and "failed to disclose that CND was using HEMA in RADICAL for the purpose of improving adhesive qualities and that CND had provided information concerning HEMA to Keystone, including Larry Steffier, well before the filing of the application for the '147 patent." (CND Answer ¶ 29.)

CND alleges, "During the prosecution of the application for the '147 patent, at least the named inventor and others involved with the prosecution of the application knowingly and with deceptive intent withheld material prior art from the PTO, including information provided to Keystone and the named inventor by CND employees." (CND Answer ¶ 30.) CND also alleges that "the named inventor and others involved with the prosecution of the application knowingly and with deceptive intent withheld material information regarding inventorship from the PTO, including the fact that CND inventors should be named as sole or joint inventors of the '147 patent." (CND Answer ¶ 31.) CND concludes that "[b]ut for the PTO's ignorance of the prior art and material information withheld by Keystone and the named inventor, one or more claims of the '147 patent would never have issued." (CND Answer ¶ 32.)

CND seeks, <u>inter alia</u>, the dismissal with prejudice of Keystone's Complaint, a declaration that the claims of the '147

Patent are unenforceable due to Keystone's inequitable conduct before the PTO, and a declaration that this is an exceptional case meriting an attorneys' fees award under 35 U.S.C. § 285.

### B. Plaintiff's Motion to Dismiss Inequitable Conduct Counterclaim and Affirmative Defense

Keystone filed a motion to dismiss [Docket Item 73] CND's inequitable conduct allegations, i.e., CND's Ninth Affirmative Defense and Third Counterclaim.[4] Keystone emphasizes that there is no evidence in the record corroborating CND's allegations.[5] Keystone argues that CND's pleadings lack many of the "who, what, when, where, and how" details that are required for

---

[4] The title of Keystone's motion refers to "inequitable conduct affirmative defenses and counterclaims." Despite the plural nouns in the title, the Notice of Motion only identifies the Ninth Affirmative Defense and Third Counterclaim. This Opinion only addresses the Ninth Affirmative Defense and Third Counterclaim.

[5] Keystone also emphasizes that CND's counterclaims in this case are not CND's "first bite at the apple" because CND made the same inequitable conduct affirmative defense and counterclaim in a previously filed case in the Southern District of California involving the '147 Patent. (Pl. Mem. Supp. Mot. Dismiss at 1.) Keystone filed a motion to dismiss the inequitable conduct allegations in the California case. Keystone argues that, in the present case, CND "had the benefit of Keystone's analysis showing why its inequitable conduct pleadings in the previously filed case were insufficient" and this prior briefing "further underscores that CND's claims are without merit." (Pl. Mem. Supp. Mot. Dismiss at 2.) The California case was dismissed with prejudice because, although that action was filed before the present action, the California action fell within an exception to the first-filed rule. The California court never addressed the merits of Plaintiff's motion to dismiss the inequitable conduct allegations and, therefore, the Court will disregard any arguments about the import of prior briefing.

pleading inequitable conduct claims under Federal Circuit law and under Fed. R. Civ. P. 9(b). (Pl. Mem. Supp. Mot. Dismiss at 4.) Keystone notes that CND does not describe which claims in the '147 patent were disclosed in Schoon's verbal description of CND's patent application and does not identify the CND employees that should have been named as inventors. Keystone also notes that CND does not identify the pending patent application that Schoon described. Keystone argues that CND's pleadings regarding mis-inventorship are inadequate and that CND failed to adequately plead intent to deceive.

In Opposition [Docket Item 83], CND argues that Keystone did not disclose to the PTO any information about CND's commercial use of HEMA. CND also argues that Keystone improperly distinguished the prior art on the basis that Keystone said the prior art involved the use of polymers, not monomers, even though CND's products involved the use of monomers. And CND argues that Keystone failed to identify Schoon as an inventor on the '147 patent.

### III. ANALYSIS

#### a. Standard of Review on Rule 12(b)(6) Motion to Dismiss

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the

light most favorable to the plaintiff, a court concludes that the plaintiff failed to set forth fair notice of what the claim is and the grounds upon which it rests that make such a claim plausible on its face.[6] Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). A complaint will survive a motion to dismiss if it contains sufficient factual matter to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Although a court must accept as true all factual allegations in a complaint, that tenet is "inapplicable to legal conclusions," and "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." Id.

In addition, "if a complaint is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." Phillips v. County of Allegheny, 515 F.3d 224, 236 (3d Cir. 2008).

---

[6] Keystone argues that CND "attaches no documents to its pleadings corroborating its claim" and that "the only 'evidence' that is proffered by CND is its own attorneys' vague characterizations as to what was supposedly said at a meeting that occurred almost twenty years ago." (Keystone Mot. to Dismiss at 6-7.) At the motion to dismiss stage, the Court tests the sufficiency of the allegations, not the evidence. Keystone's arguments about that lack of corroborative evidence lack merit at this procedural posture.

### b. Inequitable Conduct

An inequitable conduct claim invalidates a patent on the grounds that the patentee deceived the PTO while prosecuting the patent. "Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent." Therasense, Inc. v. Becton, Dickinson & Co., 649 F.3d 1276, 1285 (Fed. Cir. 2011). To prevail on an inequitable conduct claim, an accused infringer must show that the patent applicant: "(1) made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material information, and (2) intended to deceive the [PTO]." Leviton Mfg. Co., Inc. v. Universal Sec. Instruments, Inc., 606 F.3d 1353, 1358 (Fed. Cir. 2010) (internal quotation omitted).

Inequitable conduct claims must be pled with particularity in accordance with Fed. R. Civ. P. 9(b), which states: "In alleging fraud . . ., a party must state with particularity the circumstances constituting fraud . . . ." Federal Circuit law determines whether an inequitable conduct claim satisfies the Rule 9(b) requirements. See Exergen Corp. v. Wal-Mart Stores, Inc., 575 F.3d 1312, 1326 (Fed. Cir. 2009) ("we apply our own law . . . to the question of whether inequitable conduct has been pleaded with particularity under Rule 9(b)"). The Exergen court held that "in pleading inequitable conduct in patent

cases, Rule 9(b) requires identification of the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO." Id. at 1327.

The relevant "conditions of mind" for inequitable conduct include: "(1) knowledge of the withheld material information or of the falsity of the material misrepresentation, and (2) specific intent to deceive the PTO." Exergen, 575 F. 3d at 1327. Although Rule 9(b) provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," the Federal Circuit has held that inequitable conduct pleadings are subject to a higher standard:

> [A]lthough "knowledge" and "intent" may be averred generally, a pleading of inequitable conduct under Rule 9(b) must include sufficient allegations of underlying facts from which a court may reasonably infer that a specific individual (1) knew of the withheld material information or of the falsity of the material misrepresentation, and (2) withheld or misrepresented this information with a specific intent to deceive the PTO.

Exergen, 575 F.3d 1328-29.[7] An inequitable conduct claim must therefore allege that a specific individual "knew of the reference, knew that it was material, and made a deliberate decision to withhold it." Therasense, 649 F. 3d at 1290.

---

[7] The standards for pleading a claim of inequitable conduct are more lenient than the standards for obtaining relief. At the pleading stage, deceptive intent must be a reasonable inference; prevailing on an inequitable conduct claim requires a showing that deceptive intent is the single most reasonable inference. Exergen, 575 F. 3d at 1329 at n.5.

CND cites Jersey Asparagus Farms, Inc. v. Rutgers Univ., 803 F. Supp. 2d 295 (D.N.J. 2011), for the proposition that these requirements do not apply to the pleading stage because Exergen involved a motion to amend after a full trial on the merits. (CND Opp'n at 9-10.) The Jersey Asparagus court did state that "Exergen does not address the pleading standard applicable on a motion to dismiss under Rule 12(b)(6)." Jersey Asparagus, 803 F. Supp. 2d at 308. But Jersey Asparagus was decided on May 31, 2011; on August 14, 2011, the Federal Circuit decided Delano Farms Co. v. California Table Grape Comm'n, 655 F.3d 1337 (Fed. Cir. 2011), cert. denied, 133 S. Ct. 644 (2012), which held:

> A charge of inequitable conduct based on a failure to disclose will survive a motion to dismiss only if the plaintiff's complaint recites facts from which the court may reasonably infer that a specific individual both knew of invalidating information that was withheld from the PTO and withheld that information with a specific intent to deceive the PTO.

Id. at 1350. Delano Farms clearly held that to survive a motion to dismiss, a claimant must satisfy the requirement to plead facts leading to a reasonable inference of knowledge of materiality and intent to deceive. Moreover, other courts in this District have held that Exergen applies to the pleading stage. See, e.g. Sepracor Inc. v. Teva Pharmaceuticals USA, Inc., 09-CV-01302 (DMC-MF), 2010 WL 2326262, at *5 (D.N.J. June

13

7, 2010) ("the Court agrees with Plaintiff that Defendants failed to meet the stringent pleading standard set forth by the Federal Circuit in Exergen . . . .); Teva Neuroscience, Inc. v. Watson Laboratories, Inc., Civ. 10-5078 (JLL), 2011 WL 741250, at *2 (D.N.J. Feb. 24, 2011) ("The Exergen court summarized the applicable pleading standard for inequitable conduct as follows . . . ."). The Court will apply Exergen's standards.

The Federal Circuit has defined a reasonable inference as "one that is plausible and that flows logically from the facts alleged, including any objective indications of candor and good faith." Exergen, 575 F. 3d at 1329 n.5. Thus, according to the Federal Circuit, a court is not free to disregard the patentee's objective indications of candor and good faith when it assesses whether the pleadings create a reasonable inference of specific intent to deceive the PTO; at the Rule 12(b)(6) stage, any such objective indications of candor and good faith must derive only from the pleadings and those materials referenced in or attached to the pleadings that may permissibly be considered in a Rule 12(b)(6) motion.

### c. Tightening the Standards for Inequitable Conduct

In 2011, the Federal Circuit addressed problems with inequitable conduct claims and, in response, "tighten[ed] the standards for finding both intent and materiality in order to

14

redirect a doctrine that has been overused to the detriment of the public." Therasense, 649 F.3d at 1290. The Therasense court emphasized the origins of the inequitable conduct doctrine in three United States Supreme Court cases involving "deliberately planned and carefully executed scheme[s] to defraud not only the PTO but also the courts" through perjury, manufactured evidence, bribery, and/or suppression of evidence. Id. at 1287, 1293 (internal citations omitted). The Therasense court addressed problems arising from expansions of the inequitable conduct doctrine because inequitable conduct "has become an absolute plague" and "has been overplayed, is appearing in nearly every patent suit, and is cluttering up the patent system." Id. at 1289 (internal citations omitted).

In redirecting the inequitable conduct doctrine, the Therasense court emphasized that "[i]ntent and materiality are separate requirements" and that "[a] district court should not use a 'sliding scale,' where a weak showing of intent may be found sufficient based on a strong showing of materiality, and vice versa." Id. at 1290. Therasense directed district courts to "weigh the evidence of intent to deceive independent of its analysis of materiality." Id.

CND argues that Therasense "did not . . . address pleading issues and certainly did not tighten the standard for pleading

inequitable conduct . . . ." (CND Opp'n at 9.) CND's argument is
essentially that <u>Therasense</u> tightened the standards for proving
inequitable conduct, without modifying the standards for
pleading such claims.

While <u>Therasense</u> involved a district court's finding of
inequitable conduct after a bench trial, many of the concerns
that the Federal Circuit raised in that case apply to the
pleading stage. For example, the <u>Therasense</u> court noted that
"[a] charge of inequitable conduct conveniently expands
discovery into corporate practices before patent filing and
disqualifies the prosecuting attorney from the patentee's
litigation team." <u>Therasense</u>, 649 F.3d at 1288. It also
"discourages settlement and deflects attention from the merits
of validity and enforcement issues." <u>Id.</u> Inequitable conduct
disputes "increase[e] the complexity, duration and cost of
patent infringement litigation that is already notorious for its
complexity and high cost." <u>Id.</u> (citation omitted). The Federal
Circuit's concerns included the impact of loosely pled
inequitable conduct claims on the litigation process,
particularly during discovery and settlement negotiations. These
concerns necessarily involve the pleading stage because
otherwise a claim of inequitable conduct that is insufficiently
pled will open the door to intrusive and time-consuming

discovery and will color settlement negotiations in a manner than is unfair to the patentee and clogs the litigation. While CND need not prove its inequitable conduct claim at this procedural posture, it must plead a plausible claim for relief in accordance with Therasense. See Bayer Cropscience AG v. Dow Agrosciences LLC, Civ. 10-1045 (RMB-JS), 2012 WL 1253047, at *2 (D. Del. Apr. 12, 2012) ("Although the Therasense decision did not squarely address the pleading requirements for an inequitable conduct defense, but instead involved the review of a district court's opinion after a bench trial, the decision is still relevant to the pleading issues involved herein.").

Thus, the heightened standards for proving inequitable conduct recently set by the Federal Circuit are reflected in the heightened standards that are required for pleading inequitable conduct at the Rule 12(b)(6) stage. The questions for the present Opinion are thus whether CND has made sufficient factual allegations from which one can reasonably infer that a specific Keystone person knew that Keystone was withholding material information from the PTO, or giving false information to the PTO about, CND's prior art, and whether CND's factual allegations, if accepted as true for purposes of this motion, are sufficient to lead a reasonable person to infer that the same individual had the specific intent to deceive the PTO when withholding or

misrepresenting the material information, taking into account
any objective indications of candor and good faith disclosed in
the pleadings and documents referenced therein.

### d. Lack of Deceptive Intent

CND has not pled facts leading to a reasonable inference
that Keystone and the '147 patent inventors had a specific
intent to deceive.[8] The Court need not accept CND's legal
conclusion that "[d]uring the prosecution of the application for
the '147 patent, at least the named inventor and others involved
with the prosecution of the application knowingly and with
deceptive intent withheld material prior art from the PTO . . .
." (CND Answer ¶ 30.) CND has not pled sufficient facts to
permit a reasonable inference that a specific individual,
whether an inventor or others involved in prosecuting the patent
application, acted both knowingly and with specific intent to
deceive, taking into account objective indications of candor and
good faith reflected in the pleading and documents that may
permissibly be considered in a Rule 12(b)(6) motion.

As an initial matter, there are objective indications of
Keystone's candor and good faith. During the '147 Patent
prosecution process, Keystone disclosed U.S. Patent No.

---

[8] Because CND has not sufficiently pled the deceptive intent
requirement, the Court need not analyze whether CND has
sufficiently pled the other inequitable conduct requirements.

5,523,076 ("the '076 patent"), which lists Schoon as the inventor and CND as the assignee, and a "Primer Basics Article," which Schoon authored.[9] [Docket Item 73-7 at 3-4.] These objective indications of candor impede any reasonable inference that Keystone intended to deceive the PTO.

CND argues that Steffier's disclosure of the '076 patent is irrelevant because Steffier "fail[ed] to disclose to the PTO CND's commercial RADICAL product" and "[t]his information regarding commercial sales of a material prior art composition . . . goes beyond the corners of the patent application that Mr. Schoon discussed [in Irvine], was significant, and should have been disclosed to the PTO." (CND Opp'n at 13.) CND argues that "concealment of public sales information from the PTO is considered more egregious in the context of inequitable conduct than withholding a material patent reference." (CND Opp'n at 13.) But CND's pleading does not specify the commercial sales information that Keystone should have disclosed. CND has not satisfied the Federal Circuit's requirement of pleading "the specific who, what, when, where, and how of the material

_____

[9] The Court can reference the '147 patent application because it was relied upon in CND's counterclaim against Keystone. See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) ("a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings . . . . However, an exception to the general rule is that a document *integral to or explicitly relied* upon in the complaint may be considered" (citations omitted)).

19

misrepresentation or omission committed before the PTO."
Exergen, 575 F.3d at 1327.

CND's pleading also does not identify the patent application that was pending and that was described at the Irvine meeting. In 1993, Keystone was told of CND's pending patent application, although CND did not show the actual application to Keystone. In 1996, the '076 patent was issued. In 1997, Keystone applied for the '147 patent and disclosed the '076 patent in its application. If the patent application described at the Irvine meeting was eventually issued as the '076 patent, then Keystone disclosed the patent and that disclosure is not compatible with intent to deceive. If the pending patent application was not issued as the '076 patent, then CND's pleading lacks specificity in terms of explaining how Keystone acted with intent to deceive. The Therasense court reminded district courts that the inequitable conduct doctrine originated from cases where patent holders manufactured evidence, suppressed evidence, committed perjury, or engaged in bribery. CND's present allegations do not rise to the level of inequitable conduct described in Therasense.

CND argues that the '076 patent's claims "are directed to different aspects of a nail composition than the improved adhesion properties highlighted by Mr. Schoon to Mr. Steffier"

at the Irvine meeting and that "simply disclosing the '076 patent to the PTO is not equivalent to disclosing everything that was conveyed by Mr. Schoon to Mr. Steffier and Keystone." (CND Opp'n at 14.) Assuming this assertion is true and that disclosing the '076 patent did not disclose all the information that was conveyed at the Irvine meeting, CND still has not sufficiently pled a specific factual basis giving rise to a reasonable inference that Keystone had a specific intent to deceive. CND must plead intent to deceive independently of the materiality of any allegedly withheld information.

CND also argues that its pleadings show that Keystone failed to disclose CND's use of HEMA, that the two parties had a "competitive relationship," and that CND refused to conduct business with Keystone. (CND Opp'n at 17.)[10] CND argues that "[t]hese facts, when considered in view of Mr. Steffier's knowledge of the materiality of the information withheld by Keystone, are more than enough for a Court to reasonably infer that at least the named inventor, Mr. Steffier, acted with a

---

[10] CND claims that paragraphs 23 and 26 of its answer "set[] forth specific facts regarding the competitive relationship between the two parties . . . ." (CND Opp'n at 17.) These two paragraphs describe Keystone's alleged request to become a second source supplier for CND's products and CND's decision not to do business with Keystone, but they do not reference a competitive relationship. (CND Answer ¶¶ 23, 26.) If CND relies upon a competitive relationship as one of the facts demonstrating specific intent to deceive, its pleading must set forth the allegation with particularity.

specific intent to deceive the PTO." (CND Opp'n at 17.) CND's argument is essentially that the materiality of the allegedly withheld information and CND's refusal to conduct business with Keystone are sufficient to show Keystone's intent to deceive. But the Therasense court emphasized that "[a] district court should not use a 'sliding scale,' where a weak showing of intent may be found sufficient based on a strong showing of materiality . . . ." Therasense, 649 F.3d at 1290. After Therasense, it is clear that "a court must weigh the evidence of intent to deceive independent of its analysis of materiality." Id. In other words, CND must plead specific intent to deceive with factual particularity, regardless of materiality. Even if the withheld information was material and even if Keystone and CND had a competitive dynamic, CND simply has not pled facts creating a reasonable inference that Keystone had specific intent to deceive the PTO.[11]

---

[11] CND argues that Keystone deceived the PTO by distinguishing prior art on the basis that the prior art involved the use of polymers, even though CND's products used monomers. Keystone argues that when it distinguished the prior art, it was distinguishing the two specific references that the Patent Examiner had cited, not all prior art. Keystone's distinguishing statements about polymers, when coupled with Keystone's disclosures of the '076 patent and Schoon's article, again do not give rise to a reasonable inference that Keystone intentionally sought to hide the fact that CND's products used monomers.

CND also argues that Keystone disclosed the '076 patent "among 18 other less material prior art references." (CND Opp'n at 14.) CND claims that "[b]urying a material reference in a prior art statement containing a multiplicity of other references is probative of bad faith." (CND Opp'n at 14.) But Keystone's citation of the '076 patent among 18 other references is not indicative of bad faith. CND cites eSpeed, Inc. v. Brokertec USA, L.L.C., 417 F. Supp. 2d 580 (D. Del. 2006), aff'd, 480 F.3d 1129 (Fed. Cir. 2007), to support its argument. In eSpeed, however, "the declarations and exhibits amounted to over two thousand pages" and the court described the disclosures as a "blizzard of paper," which was "more consistent with an intent to hide than to disclose." Id. at 598. In this case, Keystone's disclosure statement was two pages long with 19 references, two of which were the '076 patent and Schoon's article. This disclosure statement is not a blizzard of paper indicating an intent to hide, rather than disclose.

Because CND has not pled the deceptive intent requirement and because deceptive intent must be pled with factual particularity independently of materiality, and because the objective indications of Keystone's candor and good faith militate against an inference of deceptive intent based on the presently overly-generalized allegations, CND's inequitable

23

conduct counterclaim will be dismissed. The Court need not address Keystone's other arguments. CND's inequitable conduct counterclaim will be dismissed without prejudice because, while CND has not pled facts sufficient to support an inference of deceptive intent, there is no indication at this time that a motion to amend would be futile. A proposed amended pleading that cures the defects mentioned above would suffice. The heightened standard for pleading inequitable conduct is factually demanding but it is perhaps not unattainable in this case.

### e. Motion To Strike Affirmative Defense

The Court "may strike from a pleading an insufficient defense . . . ." Fed. R. Civ. P. 12(f). "An affirmative defense is insufficient as a matter of law if it cannot succeed under any circumstances." In re Gabapentin Patent Litig., 649 F. Supp. 2d 340, 346 (D.N.J. 2009). Striking an affirmative defense "is a drastic remedy, to be resorted to only when required for the purposes of justice . . . . Courts have, however, recognized that such motions may serve to hasten resolution of cases by eliminating the need for discovery which in turn saves time and litigation expenses." Id. (citations omitted). Motions to strike "will, therefore, be granted when a defense is legally

insufficient under any set of facts which may be inferred from the allegations of the pleading." Id. (citation omitted).

As explained above, CND has not alleged a plausible inequitable conduct claim; its allegations cannot support an inequitable conduct affirmative defense for the same reasons. The Court will strike CND's Ninth Affirmative Defense without prejudice. If CND chooses to file a motion to amend, CND may also replead its inequitable conduct affirmative defense.

## IV. CONCLUSION

CND failed to pled facts supporting a reasonable inference that Keystone had intent to deceive the PTO. CND's inequitable conduct counterclaim and affirmative defense will be dismissed without prejudice and with leave to file a motion to amend its pleading within 14 days.


**June 24, 2013**                          **s/ Jerome B. Simandle**
Date                                       JEROME B. SIMANDLE
                                           Chief U.S. District Judge